UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Craig B. Shaffer

Civil Action No. 08-cv-01483-CBS-BNB

ROGER WIENER,
        Plaintiff,
v.

SUNLIGHT, INC., a Colorado corporation d/b/a Sunlight Associates, Inc.,
        Defendant.
_____

MEMORANDUM OPINION AND ORDER
_____

This civil action comes before the court on: (1)  Defendant Sunlight's "Motion to

Reduce Verdict in Accordance with Damage Cap" (filed February 2, 2011 (Doc. # 112);

(2) "Plaintiff's Motion to Amend the Final Judgment to Add Prejudgment Interest" (filed

February 9, 2011) (Doc. # 115); (3) "Plaintiff's Motion for Review of Clerk's

Determination of Bill of Costs" (filed March 8, 2011) (Doc. # 126); and (4) "Defendant's

Motion to Alter/Amend Judgment for a New Trial and for Remittitur" (filed March 8,

2011) (Doc. # 127).

On June 16, 2010, this action was referred to Magistrate Judge Craig B. Shaffer

to handle all dispositive matters including trial and entry of a final judgment in

accordance with 28 U.S.C. 636(c), Fed. R. Civ. P. 73, and D.C. COLO. LCivR 72.2.

(*See* Doc. # 41).  The court has reviewed the Motions, Plaintiff's Responses (filed

February 8, 2011 and March 9, 2011) (Docs. # 113 and # 128), Defendant's Responses

(filed March 2, 2011 and March 21, 2011) (Docs. # 122 and # 132), Defendant's Replies

(filed February 22, 2011 and March 23, 2011) (Docs. # 120 and # 133), Plaintiff's

1

Surreply (filed March 14, 2011) (Doc. # 131), Plaintiff's Supplemental Authority (filed June 14, 2011) (Doc. # 135), the exhibits, the entire case file, the record, and the applicable law and is sufficiently advised in the premises.

I.      Defendant's Motion to Reduce Verdict in Accordance with Damage Cap

Plaintiff Dr. Wiener commenced this action to recover damages for personal injuries he sustained when attempting to board the Primo chairlift at the Sunlight Ski Area near Glenwood Springs, Colorado. The case was tried to a jury which awarded Plaintiff $1,100,000 as non-economic damages.  Defendant Sunlight argues that the amount of the verdict exceeds the $250,000 cap applicable to non-economic damages recovered from a ski area operator, as set forth in Colo. Rev. Stat. § 33-44-113.

As part of the Ski Safety Act of 1979 ("SSA"), the Colorado legislature limited the damages injured skiers may obtain against ski area operators.  Colo. Rev. Stat. § 33-44-113.  Section 33-44-113 caps at $250,000.00 damages "attributable to noneconomic loss or injury."  However, the SSA excludes from the cap damages "associated with an injury occurring to a passenger while riding on a passenger tramway."  *Id.*

> The total amount of damages which may be recovered from a ski area operator by a skier who uses a ski area for the purpose of skiing or for the purpose of sliding downhill on snow or ice on skis, a toboggan, a sled, a tube, a ski-bob, a snowboard, or any other device and who is injured, excluding those associated with an injury occurring to a passenger while riding on a passenger tramway, shall not exceed one million dollars, present value, . . . and including any claim attributable to noneconomic loss or injury, as defined in sections 13-21-102.5(2), C.R.S., whether past damages, future damages, or a combination of both, which shall not exceed two hundred fifty thousand dollars. . . .

Colo. Rev. Stat. § 33-44-113.

A brief review of the evolution of Colorado law regarding "the rights, responsibilities, and liabilities of both skiers and ski area operators," *Stamp v. Vail Corp.*, 172 P.2d 437, 443 (Colo. 2007), helps put the instant motion in context. In 1965, "[t]he Colorado General Assembly initially addressed ski safety in Colorado through" the Colorado Passenger Tramway Safety Act, Colo. Rev. Stat. § 25-5-701 *et seq.* "The act's purpose is to assist in safeguarding life, health, property, and the welfare of the state in the operation of passenger tramways." *Bayer v. Crested Butte Mountain Resort, Inc.*, 960 P.2d 70, 73 (Colo. 1998) (citation omitted). "Under the Tramway Act, the primary responsibility for the design and operation of ski lifts, . . . rests with the operators; the Board is to adopt reasonable standards for the industry, but these are not intended to preclude common law negligence actions or the duty to exercise the highest degree of care." *Bayer*, 960 P.2d at 72.

In 1968, the Colorado Supreme Court had its "first occasion . . . to consider the degree of care required of a ski lift operator" in a case where the plaintiff fell and was injured while attempting to board a chair lift at a ski area. *Summit County Development Corp. v. Bagnoli*, 441 P.2d 658, 664 (Colo. 1968). The court determined that a ski lift operator must "exercise the highest degree of care commensurate with" the practical operation of a ski lift facility. *Id.* In adopting that standard of care, the Colorado Supreme Court considered as "important factors" that "the plaintiffs had surrendered themselves to the care and custody of the defendants; they had given up their freedom of movement and actions; there was nothing they could do to cause or prevent the accident." *Bagnoli*, 441 P.2d at 664 (internal quotation marks and citation omitted).

"Under the circumstances of this case, the defendants had exclusive possession and control of the facilities used in the conduct of their business and they should be held to the highest degree of care." *Id.*

In 1979 the SSA was enacted to "further define the legal responsibilities of ski area operators and their agents and employees; to define the responsibilities of skiers using such ski areas, and to define the rights and liabilities existing between the skier and the ski area operator and between skiers." Colo. Rev. Stat. § 33-44-102. The SSA's "principal function is to define the duties of ski areas and skiers with regard to activities and features on the ski slopes." *Bayer*, 960 P.2d at 74.

"In 1990, the SSA was amended to clarify the law regarding these duties and responsibilities, and to reduce for ski area operators the amount, unpredictability, and expense of litigation arising from skiing accidents . . . ." *Stamp*, 172 P.2d at 443. *See also Bayer*, 960 P.2d at 74 (in the 1990 amendments to the SSA, "the legislature limited the liability of ski area operators for accidents on the slopes involving the inherent dangers and risks of skiing.") (internal quotation marks and citations omitted). "By narrowly defining the claims that can be brought by injured skiers against ski area operators and by limiting the recovery in successful skiers' claims, the 1990 amendments broaden the SSA's protection of ski area operators." *Id.* at 443-44. "A key section of the 1990 amendments is the SSA's damages cap provision, which controls injured skiers' claims by limiting the total amount of compensatory damages that may be recovered from a ski area operator to $1,000,000 and by limiting recovery for derivative claims and claims for noneconomic damages to $250,000." *Stamp*, 172 P.2d at 444. Section 33-44-113 is "[a]nother example of the General Assembly's careful distinctions

4

between ski slope and ski lift accident liability." *Bayer*, 960 P.2d at 77.

> [T]he amendments expressly prevent ski lift operators from claiming that
> the limitation on a ski area's liability applies to causes of action arising
> from ski lift accidents.  As further confirmation of the intent to exclude ski
> lift accidents from the liability limitations, the bill's chief sponsor,
> Representative Scott McInnis, testified that the 1990 amendments to the
> Ski Safety Act would not affect common law tort liability as it related to ski
> lifts: "This bill does not exclude a ski area from negligence and the liability
> it faces with ski lifts."

*Bayer*, 960 P.2d at 77.

In 1998, on certification from the United States Court of Appeals for the Tenth

Circuit, the Colorado Supreme Court reaffirmed its holding in *Bagnoli*, that a "ski lift

operator must exercise the highest degree of care commensurate with the lift's practical

operation . . . ." *Bayer*, 960 P.2d at 72.

> We hold that the Tramway Act and the Ski Safety Act, alone or in
> combination, have not preempted or superseded the common law
> standard requiring a ski lift operator to exercise the highest degree of care
> commensurate with the practical operation of the ski lift. The General
> Assembly did not intend by either act to substitute a standard of care
> lesser than the highest degree.

*Id.*  In *Bayer*, the plaintiff boarded a double-chair, center-pole lift that was not equipped

with restraining devices on the chairs.  The plaintiff rode the lift "for about 100 yards, lost

consciousness, slumped in his chair, and slid feet first to the ground below," suffering

serious and permanent injuries from the fall.  *Id.*  The court preserved the General

Assembly's distinctions between ski slope and ski lift accident liability.  "[I]n both a

limitation of liability provision and in a limitation of damages provision related to skiing,

the General Assembly chose to write an exception preserving the liability and damages

law applicable to ski lift accidents." *Bayer*, 960 P.2d at 77.  The court noted that its

"holding in *Bagnoli* squarely placed on lift operators the duty to exercise the highest

5

degree of care consistent with the practical operation of the ski lift because (1) passengers give up their freedom of action and movement, surrendering themselves to the care and custody of the ski lift operator, (2) there is usually nothing passengers can do to cause or prevent the accident, and (3) the operator has exclusive possession and control of the ski lift." *Bayer*, 960 P.2d at 72 (citation omitted).  Underlying the court's decision in *Bagnoli* was the recognition "that ski lifts are operated at considerable height from the ground over rough, elevated, often precipitous Colorado terrain.  A fall from the lift can be calamitous.  Passengers entrust their safety to the lift operators.  Operation of a ski lift thus entails both greater danger and greater responsibility than circumstances involving ordinary care." *Bayer*, 960 P.2d at 73.

The evidence at trial conclusively established that Dr. Wiener never assumed a seated position on the Primo chairlift, but rather was struck by the approaching center-pole chair as he was standing on the "load here" board.  Dr. Wiener argues that because Sunlight admitted in the Final Pretrial Order that he was a "passenger" lawfully using a passenger tramway, his injuries were sustained "while riding" that ski lift and therefore fall outside the cap for non-economic damages.  Sunlight contends that Dr. Wiener's status as a "passenger" under § 33-44-103(4) does not conclusively govern the application of the statutory cap.

Resolution of the pending motion necessarily turns on statutory construction.

> In resolving an issue of statutory interpretation, a court's essential task is to determine and give effect to the intent of the legislature. To determine the legislature's intent, we must first look to the plain language of the statute.  If the statutory language is clear and unambiguous, we interpret the statute according to the plain and ordinary meaning of its terms.

*Maehal Enterprises, Inc. v. Thunder Mountain Custom Cycles, Inc.*, ___ P.3d ___, 2011 WL 2650236, * 5 (Colo. App. 2011) (internal quotation marks and citations omitted). "When legislative language is unambiguous," the court must "give effect to the plain and ordinary meaning of the statute without resorting to other rules of statutory construction." *Stamp*, 172 P.3d at 442-43 (citation omitted).  The court finds that it need not resort to interpretive rules of statutory construction to resolve the issue before it.

A careful reading of the SSA supports the conclusion that the Colorado General Assembly understood the import of statutory language and consciously chose when to use words of limitation.  *Cf. Carlson v. Ferris*, 85 P.3d 504, 509 (Colo. 2003) (holding that courts should not "presume that the legislature used language 'idly and with no intent that meaning should be given to its language").  The statute of limitations provision included in the SSA refers broadly to "[a]ll actions against any ski area operator . . .  brought to recover damages for injury to person or property caused by the maintenance, supervision *or operation of a passenger tramway* or a ski area."  *See* Colo. Rev. Stat. § 33-44-111 (emphasis added).  Elsewhere, the SSA defines a passenger as "any person who is lawfully *using any passenger tramway*."[1]  *See* Colo. Rev. Stat. § 33-44-103(4) (emphasis added). Yet in establishing a cap on non-economic damages, § 33-44-113 distinguishes between "a skier who *uses* a ski area" and a passenger "*riding* on a passenger tramway."[2]  Section 33-44-113 excludes from the cap

---

[1]Webster's Encyclopedic Unabridged Dictionary (2001 ed.) defines "use" to mean "employ for some purpose . . . ; to avail oneself of; apply to one's own purpose."

[2]Webster's Encyclopedic Unabridged Dictionary (2001 ed.) defines "ride" to "be borne along on or in a vehicle or other kind of conveyance; . . . to move along in any way; be carried or supported."

only damages "associated with an injury occurring to a passenger *while riding* on a passenger tramway."[3]

This court concludes that the use of the limiting language "while riding on a passenger tramway" in Colo. Rev. Stat. § 33-44-113 demonstrates a legislative intent to exclude from the damages cap only those injuries sustained while in the act of actually riding on the tramway.  This interpretation of § 33-44-113 is consistent with the unambiguous language in the statute and the Colorado courts' interpretations of the SSA.  *See Bayer*, 960 P.2d at 77.  In setting out the statutory duties of tramway passengers, the General Assembly contemplated that passengers would be engaged in various discrete activities other than riding.  For example, the SSA speaks of "board[ing] a passenger tramway," "embark[ing] upon or disembarking from a passenger tramway," "act[ing], while riding on a passenger tramway, in any manner that may interfere with proper or safe operation of such passenger tramway," and "engag[ing] in any type of conduct that may contribute to or cause injury to any other person."  *Compare* Colo. Rev. Stat. § 33-44-105(1), (2)(a), (2)(c) and (2)(d).

The court must presume, absent evidence to the contrary, that the Colorado General Assembly in drafting the damages cap purposely distinguished between being a passenger generally and being a passenger "while riding on a tramway."  *Cf. Morris v. Goodwin*, 195 P.3d 777, 779 (Colo. 2008) ("We construe statutes to give effect to the intent of the General Assembly.  To determine that intent, we look first to the plain

_____

[3]Webster's Encyclopedic Unabridged Dictionary (2001 ed.) defines "while" as "a period of interval of time; at or during this time; throughout the time that; as long as."

language of the statute, reading the words and phrases in context and construing them according to their common usage."). The facts in this case clearly place Dr. Wiener outside the latter category of plaintiffs.

In sum, the damages cap of § 33-44-113 applies to the jury's award of non-economic damages to Dr. Wiener. Thus, the verdict and judgment for non-economic damages must be reduced to $250,000.00.

II.     Plaintiff's Motion to Amend the Final Judgment to Add Prejudgment Interest

Dr. Wiener asks the court to amend the Final Judgment to include prejudgment interest. Sunlight does not contest the propriety of prejudgment interest, but disputes the amount of prejudgment interest Dr. Wiener seeks, as he does not account for the damages cap provided in Colo. Rev. Stat. § 33-44-113.

"A federal court sitting in diversity applies state law. . . regarding the issue of prejudgment interest." *Loughridge v. Chiles Power Supply Co., Inc.*, 431 F.3d 1268, 1288 (10th Cir. 2005). "[P]rejudgment interest on damages for 'personal injuries' is governed by Colorado Revised Statutes section § 13-21-101." *Professional Solutions Ins. Co. v. Mohrlang*, 2009 WL 1537970, * 2 (D. Colo. 2009). *See also USAA v. Parker*, 200 P.3d 350, 359 (Colo. 2009) ("[I]n a direct action against the tortfeasor, the "personal injury statute" governs an award of prejudgment interest.").

Section 13-21-101(1) provides:

In all actions brought to recover damages for personal injuries sustained by any person resulting from or occasioned by tort of any other person, corporation, association, or partnership, whether by negligence or by willful intent of such other person, corporation, association, or partnership and whether such injury has resulted fatally or otherwise, it is lawful for the

plaintiff in the complaint to claim interest on the damages alleged from the date said suit is filed; and on and after July 1, 1979, it is lawful for the plaintiff in the complaint to claim interest on the damages claimed from the date the action accrued. When such interest is so claimed, it is the duty of the court in entering judgment for the plaintiff in such action to add to the amount of damages assessed by the verdict of the jury, or found by the court, interest on such amount calculated at the rate of nine percent per annum on actions filed on or after July 1, 1975, and at the legal rate on actions filed prior to such date, and calculated from the date such suit was filed to the date of satisfying the judgment and to include the same in said judgment as a part thereof.  On actions filed on or after July 1, 1979, the calculation shall include compounding of interest annually from the date such suit was filed. . . .

Dr. Wiener claimed interest in the Complaint.  (*See* Doc. # 1 at ¶ 11).

Prejudgment interest must be calculated based "on the amount awarded by the final judgment, regardless of the jury's determination."  *Morris v. Goodwin*, 185 P.3d 777, 780 (Colo. 2008) (*en banc*) (disallowing a claimant to collect prejudgment interest on the portion of a jury verdict that exceeds the noneconomic damages cap imposed by statute).  Having addressed Sunlight's objection by applying the damages cap of § 33-44-113, *supra*., the court proceeds to summarize the prejudgment interest to which Dr. Wiener is entitled.

"The 'personal injury statute' requires payment of prejudgment interest at a rate of nine percent per annum from the date of the accident."  *USAA v. Parker*, 200 P.3d at 359 (citing  § 13-21-101(1)).  Section 13-21-101 "requires that simple interest be calculated on the amount of the judgment from the date the action accrued until the day before the action is filed."  *Ochoa*, 212 P.3d at 970 (citation omitted).  "The simple interest should then be added to the judgment and that sum used as the initial base amount for calculating compound interest annually from the date the action was filed until the date judgment entered."  *Id.*

10

This matter was before the court for a jury trial from January 24, 2011 through January 28, 2011.  The case was filed with the court on July 15, 2008 and concerned Dr. Wiener's claim for personal injuries which arose on March 11, 2008.  Dr. Wiener is thus entitled to recover nine percent (9%) simple interest per annum from the date of the skiing accident on March 11, 2008 until July 14, 2008, the day before the filing of his Complaint.  The jury returned a verdict to which the court applies the $250,000.00 damages cap provided by Colo. Rev. Stat. § 33-44-113.  The jury apportioned 49% of fault to Dr. Wiener and 51% of fault to Sunlight.  (*See* Special Verdict Form B (Doc. # 110-3)).  The amount of simple interest at 9% shall be added to the final judgment, which total amount becomes the basis for computing the compound interest at 9% from July 15, 2008, the date the Complaint was filed, until February 8, 2011, the date of entry of the Final Judgment.

III.     Plaintiff's Motion for Review of Clerk's Determination of Bill of Costs

The district court awarded Dr. Wiener costs pursuant to Fed. R. Civ. P. 54, D.C.COLO. LCivR 54.1, and 28 U.S.C. §1920 upon submission of a bill of costs.  (*See* Final Judgment (Doc. # 114)).  Dr. Wiener objects to the exclusion by the Clerk of the Court of his costs incurred for the deposition of Mason Martin and for blow-ups of several admitted photographic exhibits.

Dr. Wiener took the deposition of Mason Martin, Sunlight's lift operator at the Primo Lift at the time of the Dr. Wiener's injury, and paid for the original and a copy of the deposition.  Dr. Wiener incurred costs of $543.75 for the deposition.  (*See* Doc. # 126-1 at 5 of 11).  Dr. Wiener designated portions of Mr. Martin's deposition to be read

11

at trial in the event Sunlight did not call Mr. Martin as a witness.  Mr. Martin could not be located at the time of trial and Sunlight read portions of Mr. Martin's deposition into the record.  Dr. Wiener did not use or read form the deposition at trial.  The Clerk of the Court denied Dr. Wiener's request for the costs of Mr. Martin's deposition for the reason that Sunlight offered the deposition portions during trial rather than Dr. Wiener.  Dr. Wiener asserts that irrespective of which party ultimately read portions of Mr. Martin's deposition into evidence, he is entitled to the costs he incurred to take the deposition, as it appeared to "be reasonably necessary for use in the case at the time the expense was incurred."  *In re Williams Securities Litigation*, 558 F.3d 1144, 1148 (10th Cir. 2009).

"The costs statute allows a judge or clerk of any court of the United States to tax costs for transcripts and copies necessarily obtained for use in the case."  *In re Williams Securities Litigation*, 558 F.3d at 1147 (internal quotation marks and citation omitted). The award of costs associated with deposition transcripts is within the district court's "broad discretion."  *Id.*, at 1148.  The court does "not employ the benefit of hindsight in determining whether materials for which a prevailing party requests costs are reasonably necessary to the litigation of the case."  *Id.*  The determination is based "solely on the particular facts and circumstances at the time the expense was incurred." *Id.* (citation omitted).  "[I]f deposition transcripts or copies were offered into evidence, were not frivolous, and were within the bounds of vigorous advocacy, costs may be taxed."  *Id.*  *See also Stahl v. Sun Microsystems, Inc.*, 139 F.R.D. 173, 174 (D. Colo. 1991) ("When copies of depositions are reasonably necessary to the litigation, the resulting costs are generally allowable.").  While Dr. Wiener did not use or read from the

12

deposition at trial, both parties designated portions of the deposition in preparation for trial. The witness could not be located at the time of the trial. Sunlight utilized the deposition transcript at trial. The court concludes that the deposition was necessarily obtained for use in the case and that Dr. Wiener is entitled to the costs of the deposition, in the amount of $543.75.

Dr. Wiener used six blow-ups of admitted photographic exhibits during his direct examination, during cross-examination of Martin Harris, one of Sunlight's employees who was assigned to the Primo chairlift at the time Dr. Wiener was injured, and during closing argument. The Clerk denied Dr. Wiener's costs in the amount of $1,200.00 for the blow-ups for the reason that the blow-ups did not go into the jury room with the jury during deliberations. (*See* Doc. # 126-1 at 6 of 11). Dr. Wiener argues that the cost of the six blow-ups was reasonably necessary for trial and the presentation of his case.

"The necessarily obtained for use in the case standard does not allow a prevailing party to recover costs for materials that merely added to the convenience of counsel or the district court." *In re Williams Securities Litigation*, 558 F.3d at 1148. The court determines that while the blow-ups may have enhanced the presentation of Mr. Wiener's case, they were not necessary. *Compare Echostar Satellite Corp. v. Advanced Communications Corp.*, 902 F. Supp 213, 216 (D. Colo. 1995) (where witnesses in complex commercial case questioned extensively in front of jury about contents of documents, enlargements were necessary for jury to follow testimony and costs were allowed), *disagreed with on other grounds by Tilton v. Capital Cities/ABS, Inc.*, 115 F.3d 1471 (10th Cir. 1997), *with Stahl*, 139 F.R.D. at 174 (enlargements used for demonstrative purposes but not received into evidence were not necessary to a

13

proper understanding of the issues in the case and were cumulative of the testimony and exhibits presented at trial).  The court concurs with the Clerk of the Court's disallowance of the $1,200.00 cost of the blow-ups.

IV.     Defendant's Motion to Alter/Amend Judgment for a New Trial and for Remittitur

Sunlight has conceded that the court's ruling granting Sunlight's Motion to Reduce Verdict in Accordance with Damage Cap effectively moots its Motion to Alter/Amend Judgment for a New Trial and for Remittitur.  (*See* audio recording of hearing held April 21, 2011).

Accordingly, IT IS ORDERED that:

1.      Defendant Sunlight's "Motion to Reduce Verdict in Accordance with Damage Cap" (filed February 2, 2011 (Doc. # 112) is GRANTED.  The jury award of $1,110,000.00 as damages for noneconomic losses, reduced by the jury's finding of the percentage of Dr. Wiener's comparative negligence to $566,100.00, is capped at $250,000.00 pursuant to Colo. Rev. Stat. § 33-44-113.

2.      "Plaintiff's Motion to Amend the Final Judgment to Add Prejudgment Interest" (filed February 9, 2011) (Doc. # 115) is GRANTED.   An Amended Final Judgment shall enter in a separate document in favor of the Plaintiff, Roger Wiener, and against Defendant, Sunlight, Inc. as follows:

•       $1,110,000.00 as damages for noneconomic losses, capped at $250,000.00 pursuant to Colo. Rev. Stat. § 33-44-113.

•       Plus $190,000.00 as damages for physical impairment or disfigurement, reduced

14

by the jury's finding of the percentage of Mr. Wiener's comparative negligence to $96,900.00, for a running total of $346,900.00.

• Plus prejudgment interest pursuant to Colo. Rev. Stat. § 13-21-101 at 9% per annum for 125 days from March 11, 2008 until July 14, 2008 in the amount of $10,690.00 for a running total of $357,590.07.

• And compounded at 9% for 2.56 years from July 15, 2008 until February 8, 2011 for a final total of $445,858.74.

• Plus post-judgment interest at the legal rate from the date of entry of the final Judgment on February 8, 2011.

3.      "Plaintiff's Motion for Review of Clerk's Determination of Bill of Costs" (filed March 8, 2011) (Doc. # 126) is GRANTED IN PART AND DENIED IN PART.

Upon review, Dr. Wiener is entitled to the amount of $543.75 in addition to the costs already awarded by the Clerk of the Court.  (*See* Doc. # 124).

4.      "Defendant's Motion to Alter/Amend Judgment for a New Trial and for Remittitur" (filed March 8, 2011) (Doc. # 127) is DENIED as moot.

DATED at Denver, Colorado, this 29th day of September, 2011.

BY THE COURT:


 s/Craig B. Shaffer
United States Magistrate Judge